## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 05 2018, 6:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Meleeka Clary-Ghosh
Carmel, Indiana

ATTORNEY FOR APPELLEE

Michael Ghosh
Carmel, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Meleeka Clary-Ghosh,

*Appellant-Respondent,*

v.

Michael Ghosh,

*Appellee-Petitioner.*

December 5, 2018

Court of Appeals Case No.
18A-DR-821

Appeal from the Hamilton Superior Court

The Honorable Gail Bardach, Judge

Trial Court Cause No.
29D06-0908-DR-2586

**Riley, Judge.**

# STATEMENT OF THE CASE

[1] Appellant-Petitioner, Maleeka Clary-Gosh (Mother), appeals the trial court's denial of her Motion to Correct Error with respect to modification of custody and parenting time, child support arrearage, modification of child support, and the award of attorney fees in favor of Appellee-Respondent, Michael Ghosh (Father).

[2] We affirm in part, reverse in part, and remand with instructions.

# ISSUES

[3] Mother presents nine issues on appeal, which we consolidate and restate as the following five issues:

(1) Whether the trial court abused its discretion by denying Mother's petition to modify custody;

(2) Whether the trial court abused its discretion by denying Mother's petition to modify parenting time;

(3) Whether the trial court abused its discretion in denying Mother's request to modify her child support obligation;

(4) Whether the trial court abused its discretion in holding Mother in contempt for failing to pay her child support arrearage; and

(5) Whether the trial court abused its discretion by ordering Mother to pay Father's attorney fees.

# FACTS AND PROCEDURAL HISTORY

[4] In September 2007, Mother and Father got engaged, and on December 1, 2007, the couple got married. In January 2008, Mother moved from Boston to Carmel, Indiana, with Father. Mother also brought along her two daughters (Daughters) from her prior relationship. On June 26, 2008, the couple welcomed their only son, M.G. (Child). On August 13, 2009, Father filed for a divorce in Hamilton County Superior Court. By preliminary order, the trial court ordered joint legal custody, with Mother having primary physical custody of the Child.

[5] Sometime thereafter, the trial court appointed a custody evaluator at the request of Father. On January 8, 2010, the custody evaluator filed a report with the trial court, in which he recommended Father to be the sole legal and primary physical custodian of the Child. On August 30, 2010, following a hearing, the trial court issued an order (Custody Order), awarding Father sole legal and primary physical custody of the Child. Mother was awarded overnight parenting time every Wednesday from 6:00 p.m. until Thursday at 10:00 a.m.; and alternating weekends, beginning at 6:00 p.m. on Friday and continuing until Monday at 10:00 a.m. No child support was ordered.

[6] On January 4, 2011, the parties' marriage was dissolved through a property settlement agreement (Settlement Agreement). On June 17, 2011, Mother filed a petition to modify custody and parenting time which was denied. On October 7, 2011, Mother requested a change of judge and additional parenting time. On October 31, 2011, Mother filed a Notice of Appeal, to appeal the 2010 Custody

Order and the Settlement Agreement. On February 29, 2012, Father filed a motion to dismiss Mother's appeal. On December 20, 2012, this court decided that Mother's appeal to the 2010 Custody Order and Settlement Agreement was "untimely." (Appellant's App. Vol. II, p. 162).

[7] On June 19, 2013, Father filed a petition to modify parenting time. On June 25, 2013, Mother filed a request for a parenting time coordinator. On August 5, 2013, Father additionally filed a petition to modify child support. Also, on March 3, 2014, Mother filed a motion to modify custody or parenting time. Mother additionally filed a motion for recusal of judge and the appointment of a special judge. On March 10, 2014, the matter was transferred to special judge William Hughes (Judge Hughes). On March 26, 2014, a conference was held to determine the pending issues. On May 12, 2014, after a hearing, the trial court denied several motions, including Mother's request for a parenting time coordinator.

[8] On June 24, 2014, the trial court heard Father's petition to modify parenting time and child support, and Mother's petition to modify custody and parenting time. On July 10, 2014, the trial court entered an order (2014 Modifying Order), maintaining Father as the sole legal and primary physical custodian of the Child. With regards to additional parenting time, the trial court determined that the "implementation of first right of refusal under the Indiana Parenting Time Guidelines has become so difficult," therefore it "shall not apply." (Appellant App. Vol. II, p. 215). Further, the trial court also limited the parties' phone calls to the Child, providing that each party is entitled to a single ten-

minute "phone call per [24-hour] period. . . and no calls initiated to the [Child] . . . between 7:00 P.M. and 7:00 A.M." (Appellant's App. Vol. II, p. 215). Mother's midweek overnight parenting time was also eliminated, and Mother's midweek parenting time was reduced to three hours, from 4:00 p.m. until 7:00 p.m. As for child support, the trial court noted that Father was employed at a law firm making an annual salary of $92,000, or $1,775 per week. Mother was, however, unemployed and a full-time doctoral student. Notwithstanding the fact that Mother was unemployed, the trial court imputed an annual income of $40,000, or $769 per week, to Mother. As such, the trial court ordered Mother to pay weekly child support of $63.33 per week to Father.

[9]     Sometime after the 2014 Modification Order, Father left his employment and began his own legal practice. Father's annual income reduced from $92,000 to about $35,000. On October 28, 2015, Mother tried to modify her weekly child support obligation of $63.33. Arguments were heard on three separate days in 2016. On October 26, 2016, the trial court effectively denied Mother's request to change her weekly child support payment of $63.33; instead, it increased Mother's weekly support obligation to $131. In reaching that conclusion, the trial court found Father's testimony "persuasive" that his earning ability had gone down to a weekly gross income of $677. (Appellee's App. Vol. II, p. 5). As for Mother, the trial court continued to impute Mother's potential income as $40,000, or $769 per week. Following that order in October 2016, Mother obtained a job, and she currently works twenty hours a week with a base pay of $8 an hour, or $160 per week.

[10] On December 2, 2016, Father filed a contempt petition against Mother for nonpayment of child support. Two days later, on December 5, 2016, Mother filed a petition seeking to reduce her child support obligation. The following week, on December 12, 2016, Mother filed a motion for change of judge and venue. On January 3, 2017, Mother filed a motion to modify legal custody and parenting time, and for the appointment of a parenting time coordinator and a Guardian *Ad Litem* (GAL). On February 7, 2017, Mother filed an emergency motion for contempt regarding phone calls, texting, the right of first refusal, and the sharing of school information. The trial court set all motions for a hearing. On February 14, 2017, the trial court denied the Mother's emergency motion for contempt, along with previously filed motions to correct error.

[11] On February 27, 2017, following a hearing, the trial court denied Mother's request for the appointment of a parenting time coordinator but granted her request on the appointment of a GAL. On April 24, 2017, the trial court appointed GAL Judy Hester (GAL Hester). On September 22, 2017, GAL Hester filed her report with the trial court. Among other things, GAL Hester recommended Father to remain the sole legal and primary physical custodian of the Child; Mother's midweek and alternating weekend parenting time to remain unchanged; that both parties should limit their lunches at the Child's school; and that each parent have a single five minute phone call per day with the Child on days when that parent has no parenting time.

[12] Between May 2017 through January 2018, Mother's petition to modify custody, parenting time, and child support, along with Father's contempt petition for

nonpayment of child support, were heard on separate days with multiple continuances. The final hearing was held on January 8, 2018. On February 27, 2018, the trial court entered an Order finding Mother in contempt for not paying child support, denied Mother's petition to modify child support; denied Mother's petition to modify custody and parenting time; and ordered Mother to pay Father's attorney fees. On March 22, 2018, Mother filed a motion to correct error which was denied.

[13]    Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Modification of Legal Custody*

[14]    Mother claims that the trial court abused its discretion by denying her petition to modify custody of the Child to a joint custody arrangement. We review custody modifications for an abuse of discretion, with a "preference for granting latitude and deference to our trial [courts]." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). We will find an abuse of discretion if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Haley v. Haley*, 771 N.E.2d 743, 747 (Ind. Ct. App. 2002). We do not reweigh evidence or assess the credibility of witnesses, and we consider only the evidence most favorable to the trial court's decision. *Id.* The party seeking modification bears the burden of proving that the existing custody order should be altered. *Id.* To warrant reversal on appeal, the evidence "must positively

require the conclusion contended for by [the] appellant." *Bettencourt v. Ford*, 822 N.E.2d 989, 997 (Ind. Ct. App. 2005).

[15] Under Indiana Code section 31-17-2-21, a court may not modify a child custody order unless modification is in the child's best interests and there is a substantial change in one of the several factors. Indiana Code section 31-17-2-8 provides that the factors relevant to a custody order are as follows:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;
>>
>> (B) the child's sibling; and
>>
>> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
>> (A) home;
>>
>> (B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a [*de facto*] custodian . . .

[16] With respect to legal custody, the welfare of the children, not the wishes and desires of the parents, is the primary concern of the courts. *Carmichael v. Siegel*, 754 N.E.2d 619, 635 (Ind. Ct. App. 2001). Further, stability is a crucial factor which trial courts must take into account when determining the best interests of a child in the context of a custody modification. *Harris v. Smith*, 752 N.E.2d 1283, 1288 (Ind. Ct. App. 2001).

[17] On appeal, Mother does not allege that a substantial change has taken place with regard to the statutory factors set forth in Indiana Code section 31-17-2-8; instead, Mother merely argues that Father failed to act in the Child's best interest on matters affecting the Child's medical care, and education.

[18] First, Mother asserts that Father, who has sole legal custody of the Child, had instructed the school nurse not to contact her in case of a medical emergency. Mother does not comprehend the responsibilities delegated to a parent who has sole legal custody, which includes the making of unfettered decisions concerning a child's education, health care, and religious training.

Furthermore, there is no notation from the trial court's initial 2010 Custody Order, or in the 2014 Modification Order, that Father's decisions on matters affecting the Child's medical care was somehow restricted. Moreover, in the Order in which Mother now appeals, the trial court ordered Father "to inform the school that Mother can authorize over-the-counter medication at the school, when the school nurse is supervising a medical situation with [the Child], if Father cannot be reached to give that authorization." (Appellant's App. Vol. II, p. 130).

[19] Mother also argues that the award of a joint legal custody arrangement was imperative since Father had improperly influenced the Child. Here, Mother contends that Father led the Child to believe that she was incapable of supervising the Child's homework. We find Mother's contention wholly unsupported by the evidence. Father informed GAL Hester that he always ensured the Child's homework was done before Mother picked up the Child for her midweek parenting time on Wednesday. While interviewing the Child, GAL Hester explored the idea of the Child going straight to Mother's home on Wednesday after school and doing his homework at Mother's house. GAL Hester noted that the Child gave "a quick negative response" and the Child further expressed that he would "go back to having trouble getting his homework done in a timely manner." (Appellant's Exh. Vol. II, p. 13). Based on the Child's reaction, GAL Hester concluded that it was in the Child's "best interest to study" with Father rather than with Mother. (Appellant's Exh. Vol. II, p. 13). Also, the Child's third grade teacher informed GAL Hester that

Father was keen on the Child's homework. Mother did not present any evidence that Father had expressly conveyed to the Child that she was inept in helping the Child with his homework; rather, the only evidence supporting Mother's argument is the Child's innocent expression that he would end up being tardy on completing his homework if Mother was left to supervise.

[20] Moreover, "[W]e have held that 'if the parties have made child-rearing a battleground, then joint custody is not appropriate.'" *Carmichael*, 754 N.E.2d at 635 (quoting *Periquet-Febres v. Febres*, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995), *trans. denied*.). The issue in determining whether joint legal custody is appropriate is not the parties' respective parenting skills, but their ability to work together for the best interests of their children. *Carmichael*, 754 N.E.2d at 635. We note that in the initial 2010 Custody Order, the trial court awarded Father sole legal custody of the Child due to the ongoing conflict between the parties. In the 2014 Modification Order, the trial court continued Father's role as the sole legal custodian. The record is replete with evidence of the parties' inability to effectively communicate and cooperate concerning the Child's upbringing. Finally, we note that keeping Father's role as sole legal custodian ensures stability to the Child. Since the Child was two years old, he has been in Father's care, Father has been the parent who oversees and makes legal decisions related to the Child and to alter whatever processes or procedures Father has in place would undoubtedly result in some changes that would impact the Child. Based on the foregoing, the record amply supports the trial

court's position to keep sole legal custody of the Child with Father, therefore, we find no abuse of discretion.

## II. *Modification of Parenting Time*

[21] In all parenting time controversies, courts are required to give foremost consideration to the best interests of the child. *A.G.R. ex rel. Conflenti v. Huff*, 815 N.E.2d 120, 125 (Ind. Ct. App. 2004), *trans. denied*. When reviewing the trial court's resolution of a parenting time issue, we reverse only when the trial court manifestly abused its discretion. *Id*. We will not reweigh evidence or reassess the credibility of witnesses. *Id*. Rather, we view the record in the light most favorable to the trial court's decision to determine whether the evidence and reasonable inferences therefrom support the trial court's decision. *See id*. If the record reveals a rational basis for supporting the trial court's determination, no abuse of discretion occurred. *Id*. We generally give "considerable deference to the findings of the trial court in family law matters" as a reflection that the trial court is in the best position to judge the facts and to get a sense of the parents and their relationship with the children—the kind of qualities that appellate courts would be in a difficult position to assess. *Shelton v. Shelton*, 835 N.E.2d 513, 516 (Ind. Ct. App. 2005).

[22] "A parent not granted custody of the child is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time by the noncustodial parent might endanger the child's physical health or significantly impair the child's emotional development." Ind. Code § 31-17-4-2. Although section 31-17-4-2 uses the phrase "might endanger," we have previously held

the language to mean that a trial court "may not restrict parenting time unless that parenting time 'would' endanger" the child's health or emotional development. *D.B. v. M.B.V.,* 913 N.E.2d 1271, 1274-75 (Ind. Ct. App. 2009).

[23]  Mother argues that the trial court abused its discretion by (1) limiting her communication with the Child via phone; (2) reducing her involvement at the Child's school; and (3) denying her an opportunity for additional parenting time.

A.  *Limited Calls to the Child*

[24]  Parenting Time Guidelines § I A (3) provides in pertinent part that:

> Both parents shall have reasonable phone access to their child at all times.  Telephone communication with the child by either parent to the residence where the child is located shall be conducted at reasonable hours, shall be of reasonable duration, and at reasonable intervals, without interference from the other parent.

[25]  Here, the trial court ordered that

> Each parent is to have no more than one [five-minute] phone call each day with [the Child] on days when that parent has no parenting time with [the Child].  That phone call is to be placed between 4:00 p.m. and 7:00 p.m.  Each parent may have one text with [the Child] on any given day, with that text to be placed between 12:00 noon and 7:00 p.m.

(Appellant's App. Vol. II, p. 130).  Mother argues that the trial court abused its discretion by limiting her communication with the Child via phone.

[26] Turning to the record, in her report, GAL Hester wrote, in relevant part, "Mother's position is that she must have contact with [the Child] every day . . . At the same time, one of Father's biggest concerns is that Mother's telephone calls and texting [] are unreasonably intrusive and detrimental" to the Child. (Appellant's App. Vol. II, p. 166). GAL Hester added that the "frequency, length, and timing of the calls and text" to Child were significantly more when the Child was in Father's care. (Appellant's App. Vol. II, p. 166). GAL Hester continued, "[f]rom Father's perspective, [the Child] is talkative on the phone with everyone he talks to *except* with Mother." (Appellant's App. Vol. II, p. 166) (italics in original). Based on her findings, GAL Hester concluded that while she appreciated Mother's desire to talk with the Child on a daily basis, "in the current situation where the parties do not live together and do not get along, as recognized by [the Child], it is not in [the Child's] best emotional interest to force that situation." (Appellant's App. Vol. II, p. 175). As such, GAL Hester recommended that either party should be allowed to have a single five-minute "phone call per day with [the Child] on days when" either party "has no parenting time" with the Child. (Appellant's App. Vol. II, p. 176).

[27] During the hearing, GAL Hester reiterated her recommendation of limiting the parties' phone calls to the Child to five minutes. When asked if she agreed with GAL Hester's recommendation, Mother passionately stated "No" and added, "I don't think limiting another parent's phone calls is the solution. I think if you want a solution to it, then you give the other parent some more parenting time." (Tr. Vol. II, p. 84). In turn, Father argued, "[Y]ou know, five minutes is

more than enough time. I don't ever really exceed five minutes myself, so I am fine with it." (Tr. Vol. II, p. 225).

[28] "[A]ppellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence.'" *D.C. v. J.A.C.*, 977 N.E.2d 951, 956-57 (Ind. 2012). We reiterate that we "shall not set aside the findings or judgment unless clearly erroneous," and "[f]indings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id* at 953.

[29] We note that some of the relevant factors placed before the trial court are in equipoise. Both Mother and Father are loving and good parents. However, both have divergent views about the amount of time the other should spend on the phone talking to the Child at the end of the day. For instance, Father informed GAL Hester that Mother would drop off the Child at 7:00 p.m. on Wednesday after her midweek parenting time, and Mother would call at "around 7:15 [p.m.] and insists on talking with [the Child] for 15 minutes." (Appellant's App. Vol. II, p. 166). At the hearing, Father testified that five minutes was enough time to talk to the Child, while Mother was opposed to any sort of limitation. Here, however, looking only to the evidence and all inferences favorable to the judgment, giving due regard to the opportunity of the trial court to personally observe the witnesses, and refraining from the substitution of our view for that of the trial court, we find that the evidence is

not lacking as to render the trial court's judgment, limiting Mother's phone calls to the child, erroneous.

B. *Mother's Involvement at the Child's School*

[30] Mother next challenges the trial court's Order limiting her involvement at the Child's school. Parenting Time G.I (D)(3) provides, in relevant part, that "A parent shall not interfere with the opportunity of the other parent to volunteer for or participate in a child's activities."

[31] From her interaction with the Child's fourth grade teacher, GAL Hester discovered that Mother goes to the Child's school "almost daily." (Appellant's App. Vol. II, p. 170). According to the Child's fourth-grade teacher, Mother "volunteers for everything, comes to every event, and then has lunch with the Child in the school lunch room several times a week." (Appellant's App. Vol. II, p. 170). The Child's fourth-grade teacher opined that Mother's visits impeded the Child's "ability to socially interact with his peers." (Appellant's App. Vol. II, p. 170). Based on her findings, GAL Hester recommended that both parties should limit their involvement at the Child's school in order to "give [the Child] time to work on social relationships with his peers and to understand that his parents know he is capable of handling himself during the school day and is not a baby." (Appellant's App. Vol. II, p. 176).

[32] GAL Hester offered testimony that the Child's only friends were at school, and the Child "truly enjoys being with his friends." (Tr. Vol. II, p. 13). Mother testified that she went to the Child's school at least three times a week, and that

she volunteered at the school library and lunchroom "whenever" her schedule allowed. (Tr. Vol. II, p. 123). Father consequently testified that Child is

> getting at that age where, you know, it was fun a few years ago for having a parent come there, but you know, as you get older, you know there's kind of a stigma amongst your friends that oh, your parent is coming. I mean I used to go to lunch a few times a year and I thought that was reasonable. I don't do it anyone [sic]. One, because she's there all the time and then two, I feel like he needs to have that space. You know, he's around his friends. Let him have that space.

(Tr. Vol. II, p. 223). On this issue, the trial court ordered:

> Both parties are to limit lunches with [the Child] at school, and/or bringing lunches to school at lunch time, to no more often than twice each month. Neither parent is to volunteer at the school in [the Child's] classroom, though each can volunteer in other capacities at the school. The [c]ourt finds these recommendations of the [GAL] to be particularly appropriate in that they should allow [the Child] to, along with his participation in after-school care, develop and establish same-age relationships and appropriate behavior within those relationships.

(Appellant's App. Vol. II, pp. 129-130). Contrary to Mother's claim that the trial court abused its discretion by limiting her presence at the Child's school, the Order restricted both parties. Moreover, the trial court explained that limiting the parents' involvement at the Child's school would enable the Child to thrive at school and develop a positive and meaningful relationship with his friends. Here, we conclude that the trial court did not abuse its discretion by limiting Mother's participation at the Child's school.

## C. *Opportunity for Additional Parenting Time*

[33] Mother contends that the trial court abused its discretion by denying her an opportunity for additional parenting time "when the [C]hild gets out of school and before [Father] is home from work instead of the [C]hild being in after school care." (Appellant's Br. p. 27).

[34] The Guidelines "are based on the premise that it is usually in a child's best interest to have frequent, meaningful and continuing contact with each parent." Parenting Time Guidelines Preamble. Accordingly, the Guidelines provide:

> When it becomes necessary that a child be cared for by a person other than a parent or a responsible household family member, the parent needing the child care shall first offer the other parent the opportunity for additional parenting time, if providing the child care by the other parent is practical considering the time available and the distance between residences. The other parent is under no obligation to provide the child care. If the other parent elects to provide this care, it shall be done at no cost and without affecting child support. The parent exercising additional parenting time shall provide the necessary transportation unless the parties otherwise agree.

Parenting Time G.I (C)(3). Often "mistakenly referred to as the 'right of first refusal[,]' "this section more accurately provides "an opportunity to exercise additional parenting time." Parenting Time G. I(C)(3) cmt. In the instant case, the trial court concluded that the Child "is to remain in after-school care in accordance with the current parenting time schedule with no opportunity for additional parenting time to be offered." (Appellant's App. Vol. II, p. 129).

[35]     The issue of additional parenting time was addressed in 2014, and it is evident from the 2014 Modification Order that the trial court eliminated that option due to the conflict between the parties. Specifically, the trial court held that the "implementation of first right of refusal under the Indiana Parenting Time Guidelines has become so difficult," therefore it "shall not apply." (Appellant App. Vol. II, p. 215). Indeed, Father testified that the issue of more parenting time has been highly contentious over the years, and "it just causes nightmares and, you know, opening that door back up is [] just going to be a pain. I don't think it benefits anybody." (Tr. Vol. II, p. 222). When asked to explain his statement, Father stated that there were "so many problems" with additional parenting time, and that conflict affected the Child and led him to develop "behavioral" problems. (Tr. Vol. II, p. 222). Father added that after the trial court ended the possibility of additional parenting time and the Child began attending aftercare school, the Child's behavioral problems "went away." (Tr. Vol. II, p. 223). Also, Father alluded to the fact that Mother did not have enough time to exercise more parenting time in the evenings since Mother worked part-time and was a full-time doctoral student.

[36]     Contrary to Mother's argument that the trial court abused its discretion by denying her an opportunity for additional parenting time when Father is unavailable, Mother testified, "I don't have a problem with the [after-school] program. What I have a problem is . . . if . . . he's only going because [] I can't do [] his homework with him. But if he's going because of the [] friends, that's

not a problem with me. I am okay doing that. But I would still like to have extra time with him." (Tr. Vol. II, p. 80).

[37] Based on the facts and circumstances before us, we conclude that the trial court did not patently abuse its discretion by denying Mother an opportunity for additional parenting time when Father is unavailable.

IV. *Modification of Child Support Obligation*

[38] Mother argues that the trial court abused its discretion by failing to modify her Child support obligation of $131 per week. Generally, decisions regarding child support rest within the sound discretion of the trial court. *Painter v. Painter*, 773 N.E.2d 281, 282 (Ind. Ct. App. 2002). We will reverse a trial court's decision in child support matters only for an abuse of discretion or if the trial court's decision is contrary to law. *Id.* An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Burke v. Burke*, 809 N.E.2d 896, 898 (Ind. Ct. App. 2004).

[39] Child support orders may be modified based upon the following statutory guidelines:

> (1) upon a showing of changed circumstances so substantial and
> continuing as to make the terms unreasonable; or

> (2) upon a showing that:

> (A) a party has been ordered to pay an amount in child support
> that differs by more than twenty percent (20%) from the amount
> that would be ordered by applying the child support guidelines;

\* \* \*

I.C. § 31-16-8-1.

[40] On appeal, Mother's main argument is that the trial court abused its discretion by failing to consider her new income of $160 as a changed circumstance, thereby making the $131 which she currently pays in child support, unreasonable.

[41] On October 28, 2015, Mother sought to modify her weekly child support obligation of $63.33. Arguments were heard on three separate days in 2016. On October 26, 2016, the trial court effectively denied Mother's request to modify her weekly child support payment of $63.33; instead, the trial court increased Mother's child support obligation to $131. In reaching that conclusion, the trial court found Father's testimony "persuasive" and that his weekly gross income had decreased from $1,775 to $677. (Appellee's App. Vol. II, p. 5). Mother was still unemployed, and the trial court continued to impute Mother's potential annual income at $40,000 or $769 per week.

[42] It is well established that changes in employment and relative financial resources of the parties have been held sufficient to support a modification in child support. *Walters v. Walters*, 901 N.E.2d 508, 511 (Ind. Ct. App. 2009); *see also Harris v. Harris*, 800 N.E.2d 930, 938 (Ind. Ct. App. 2003), *trans. denied*.

[43] Following the October 2016 support order, Mother obtained a job and currently works twenty hours a week with a base pay of $8 an hour or $160 per week.

Mother, who has two daughters in college, receives weekly child support payments of $165 from her daughters' father; however, Mother testified that she spends $647.47 per week to support them. In support of her weekly legal support obligation of $647.47 for her prior born daughters, Mother offered a financial declaration form.

[44] Given that Mother offered testimony of her changed income, we conclude that the trial court's denial of Mother's petition to modify her child support obligation, was an abuse of discretion. Accordingly, we reverse that portion of the Order, and we remand for further proceedings.[1]

### IV. *Contempt: Child Support Arrearage*

[45] Mother claims that the trial court erred by finding her in contempt for not paying her child support arrearage. To hold a party in contempt for violating a court order, the trial court must find that the party acted with "willful disobedience." *Himes v. Himes*, 57 N.E.3d 820, 829 (Ind. Ct. App. 2016), *trans. denied*. With respect to child support, "[s]imply establishing the existence and knowledge of an arrearage may not amount to a 'willful disregard of a court

---

[1] Mother also argues that the trial court erred by not awarding her credit for her two prior-born daughters. Because we are remanding to the trial court for further proceedings, we believe Mother's issue should be addressed then. Accordingly, we need not discuss this issue on appeal.

order.'" *Id.* (quoting *Sutton v. Sutton*, 773 N.E.2d 289, 297 (Ind. Ct. App. 2002)). The trial court must also find that the party had the ability to pay the child support. *Woodward v. Norton*, 939 N.E.2d 657, 662 (Ind. Ct. App. 2010). We will reverse the trial court's finding of contempt where an abuse of discretion has been shown, which occurs only when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Marks v. Tolliver*, 839 N.E.2d 703, 707 (Ind. Ct. App. 2005). When we review a contempt order, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* The party in contempt bears the burden of demonstrating that her acts were not "willful." *Emery v. Sautter*, 788 N.E.2d 856, 859 (Ind. Ct. App. 2003).

[46] Through the October 26, 2016, Support Order, the trial court imputed annual income of $40,000, or $769 per week, to Mother. Accordingly, the trial court ordered Mother to pay weekly child support of $131. On December 2, 2016, Father filed a petition, arguing that Mother should be held in contempt for not paying her child support. During 2017 and through January 2018, evidentiary hearings were conducted on the parties' pending motions and petitions including Father's contempt motion against Mother. The last hearing was conducted on January 8, 2018. Father presented Exhibit 5 which was a computation of Mother's child support arrearage:

**CHILD SUPPORT ARREARAGE**

Order Modifying Child Support issued on October 26, 2016:
First Friday after Order (10/28/16) to January 5, 2018= 62

weeks

62 weeks x $131.00= **$8,122.00** (Child Support Owed)

Child Support Paid from 10/31/16 to 9/19/17= **$5,471.43** (Payment History Printout)
Child Support Paid from 10/4/17 to 1/8/18= **$1,370.00** (Bank records)
***
Arrearage Calculation from 10/28/16 to 1/8/18:

$8,122.00 - $5,471.43 - $1,370.00= **$1,280.57**

Arrearage Calculation from 10/26/16 Order retroactive to 10/30/15:

Prior Child Support Amount= $63.00/wk.
Modified Child Support Amount= $131.00/wk.
Difference: $131.00 - $63.00= $68.00/wk.
Total Number of Weeks from 10/30/15 to 10/26/16= 51 weeks
Arrearage: $68.00 x 51= **$3,468.00**

Arrearage from 7/10/14 Order to 10/26/16 Order:

Arrearage per 7/10/14 Order-**$3,087.00**
Arrearage remaining as of 10/26/16 Order= **$2,345.00** (Reduced to Judgment)

TOTAL ARREARAGE (from 7/10/14 Order to 1/8/18)
$1,280.57 + $3,468.00 + $2,345.00= **$7,093.57**

(Exhibit 5). In the Order finding Mother in contempt, the trial court found that

The Court finds that Mother has the ability to pay her child support obligations. In addition to working part time, she apparently has the time and resources to spend working on her dissertation, and she apparently has time and resources sufficient to travel to audition for movies, and to travel extensively for enjoyment and/or other personal reasons. During the less than nine months beginning May 2017, and continuing only through the first eight days of January, 2018, she made four or five trips to Boston, Massachusetts, two or three to New York, two to Florida, one to Arizona, California, Las Vegas and Oklahoma, one to Indiana Beach, one to the Dominican Republic, and one to Barcelona, Spain. There is an extensive record, as well, of the out-of-state and out of country travels which she made which precede in time the time period just described.

The Court additionally finds that Mother has willfully disregarded her obligations to pay child support. Calculated only through January 8, 2018, she has a total arrearage in the amount of $7,093.57, which she has not paid.

(Appellant's App. Vol. II, p. 128).

[47] At the hearing, Father presented an updated list of Mother's 39 out-of-town trips from 2014 through 2018. Several of those trips were international trips to Mexico, Brazil, Aruba, Costa Rica, Dominican Republic, and Spain. While Father acknowledged that some of Mother's trips were work-related, Father testified that most of them were "personal" trips. (Tr. Vol. II, p. 223). In turn, Mother asserted that her fiancé, (Fiancé), and her sister (Sister) financed all of her trips. For instance, Mother claimed that Fiancé paid for the Spain trip since it was her "birthday month." (Tr. Vol. II, p. 136). Mother similarly stated that the trip to Dominican Republic was paid for by Fiancé. Mother, who was born

in Boston, stated that she had travelled several times to Boston to see her family and one time to attend a funeral. Mother had also travelled to North Carolina for a funeral. Mother, who is an actress, further explained that some of her local trips to New York and Chicago, were for auditions. (Tr. Vol. II, p. 138).

[48] In light of the conflicting evidence presented by the parties regarding Mother's trips as a sign of ability to comply with the October 26, 2016, support order, and the trial court's role as the finder of fact, we are not left with a firm and definite belief that a mistake was made by the trial court. Accordingly, we conclude that the trial court did not abuse its discretion in finding Mother to be in contempt of the October 26, 2016 child support order.

IV. *Attorney Fees.*

[49] Mother argues that the trial court abused its discretion by directing her to pay $14,000 of Father's attorney fees. According to Indiana Code section 31-17-7-1, the court may order a party to pay a reasonable amount for the cost of the other party maintaining an action for custody modification and for attorney fees and mediation services. *Haley v. Haley*, 771 N.E.2d 743, 745 (Ind. Ct. App. 2002). The trial court has broad discretion in awarding attorney fees. *In re Marriage of Bartley*, 712 N.E.2d 537, 546 (Ind. Ct. App. 1999). We will reverse the trial court's decision to award attorney fees only if the decision is clearly against the logic and effect of the facts and circumstances. *Id*. When determining whether an award of attorney fees is appropriate, the court may consider such factors as the resources of the parties, the relative earning ability of the parties, and other factors which bear on the reasonableness of the award. *Id*. Any misconduct on

the part of one party which causes the other party to directly incur additional fees may be taken into consideration. *Meade v. Levett*, 671 N.E.2d 1172, 1179 (Ind. Ct. App. 1996). When one party is in a superior position to pay fees over the other party, an award of attorney fees is proper. *Bartley*, 712 N.E.2d at 546.

[50] In directing Mother to pay Father's legal fees, the trial court stated:

> The [c]ourt agrees with Father's counsel that there has been no change in circumstance substantial enough to justify any modification of child support, custody or parenting time. The [c]ourt tends to agree with counsel's statement that the only change in the case is the change of the judge deciding the issues. That being the case, the [c]ourt finds it appropriate to award attorney fees to Father.

> The [c]ourt ORDERS Mother to pay Father's attorney fees, in the amount of $14,000.00, as same are attributable only to the six Motions and Petitions filed and argued in this case since December 2, 2016.

(Appellant's App. Vol. II, p. 229). We find that the trial court's order is devoid of any discussion of the pertinent factors such as Mother's financial resources, her relative earning ability, the reasonableness of the attorney fees award, or misconduct on Mother's part. *Bartley*, 712 N.E.2d at 546. However, the order reveals that the trial court based its decision on the six litigation events that occurred on and after December 2, 2016.

[51] During his closing arguments, Father's counsel argued that Mother's numerous filings has been the "[*modus operandi*]" since the parties' divorce. (Tr. Vol. II, p.

246). Father's counsel added, "[W]hen [Mother] gets an order she doesn't appreciate, doesn't approve of, doesn't like, she exercises her constitutional right to modify - move to modify the order and/or move to appeal it, but . . .[Father] is entitled to ask" for attorney fees. (Tr. Vol. II, p. 246). In addition, Father tendered into evidence an affidavit from his counsel averring that between December 2016 and January 2018, Father had incurred "$10,427.00" in legal fees to address the multiple motions filed by Mother. (Appellant's Exh. Vol. II, p. 37).

[52] Turning to the record, we note that on December 2, 2016, Father filed his contempt petition against Mother for unpaid child support payments. On December 5, 2016, Mother responded by filing a petition to modify her child support obligation. The following week, on December 12, 2016, Mother filed a motion for change of judge and venue. On January 3, 2017, Mother filed a motion to modify legal custody and parenting time and for the appointment of a parenting time coordinator and a GAL. On February 7, 2017, Mother filed an emergency motion for contempt regarding phone calls, texting, the right of first refusal, and the sharing of school information. On February 14, 2017, the trial court denied the Mother's emergency motion for contempt, along with previously filed motions to correct error.

[53] While we note that Mother was successful in her motion to change the judge and the appointment of a GAL, Mother persisted in filing motions seeking to achieve the same result, and Father presented evidence of the legal fees he has incurred since December 2016. Mindful of the trial court's discretion in

awarding attorney's fees and Mother's numerous filings, we cannot say that the trial court improperly granted Father an award of attorney's fees.

# CONCLUSION

[54] Based on the foregoing, we conclude that the trial court did not abuse its discretion in denying Mother's petition to modify custody and parenting time. Also, we hold that the trial court did not abuse its discretion by ordering Mother to pay Father's attorney fees. However, considering Mother presented evidence of her change in income, we hold that the trial court abused its discretion in denying Mother's petition to modify her child support obligation; therefore, we reverse and remand for proceedings consistent with this opinion.

[55] Affirmed in part, reversed in part, and remanded.

[56] Vaidik, C. J. and Kirsch, J. concur